NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANTONY VON DER MUHLL KOSTALAS, | Civil Action No. 15-3394 (JMV) |
| Plaintiff, | |
| v. | **OPINION** |
| WILBUR ROSS, *Secretary*, *United States Department of Commerce*, | |
| Defendant. | |

**John Michael Vazquez**, U.S.D.J.

This matter comes before the Court by way of Defendant Wilbur Ross'[1] motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (ECF No. 84). Plaintiff Antony Von Der Muhll Kostalas filed opposition and Defendant replied. (ECF Nos. 85, 87). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants Defendant's motion.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Ross is automatically substituted for his predecessor, Penny Pritzker.

# I.    BACKGROUND[2]

Plaintiff has worked in the area of international trade for around forty years and holds a bachelor's degree in international economics and a master's degree in economics. (Pl.'s SMF ¶ 1). From 1980 until February 21, 2012, Plaintiff worked for the United States Department of Commerce ("Commerce"), holding various positions over the years. (Def.'s SMF ¶ 1; Pl.'s SMF ¶¶ 3–4). Starting in February 2003, and continuing until the end of his employment with Commerce, Plaintiff worked as a trade specialist in the Newark office of Commerce's International Trade Administration ("the ITA"). (Def.'s SMF ¶¶ 3–4; Pl.'s SMF ¶ 4). As a trade specialist, Plaintiff was tasked with growing and developing the export opportunities of the United States. (Def.'s SMF ¶ 5).

Plaintiff has suffered from obsessive compulsive disorder ("OCD") for most of his life. (Def.'s SMF ¶ 2). Though Plaintiff has received treatment for his OCD symptoms since 1977, he did not inform Commerce or the ITA of the OCD until April 2010. (*Id.*; Pl.'s SMF ¶ 11).

Defendant states in his brief, and Plaintiff does not contest, that trade specialists were evaluated by their supervisors and given a performance rating that ranged from "Level 1," representing the lowest score, to "Level 5," representing the highest score. (ECF No. 84-1 at 4). The employee evaluation records for Plaintiff only go back as far as fiscal year 2007–2008, in which Plaintiff received a Level 2 overall performance rating. (Def.'s SMF ¶¶ 6, 9). It is

---

[2] This background is taken from the parties' statements of material facts, pursuant to Local Civil Rule 56.1. (ECF No. 84-46, Defendant's Statement of Material Facts ("Def.'s SMF"); ECF No. 86 at 1–28, Plaintiff's Response to Defendant's Statement of Material Facts; ECF No. 86 at 29–57, Plaintiff's Counter-Statement of Material Facts ("Pl.'s SMF"); ECF No. 87-5, Defendant's Response to Plaintiff's Counter-Statement of Material Facts). To the extent that Plaintiff admits to any material facts as stated by Defendant, the Court cites only to "Def.'s SMF" and the relevant paragraph number. To the extent that Defendant does not contest facts asserted by Plaintiff, the Court refers to "Pl.'s SMF" and the relevant paragraph number.

uncontested that Plaintiff exceeded Commerce's expectations in fiscal year 2007–2008 regarding new client development and client counseling sessions, but that Plaintiff failed to meet his other obligations. (Def.'s SMF ¶ 8). For example, Plaintiff completed only 23 out-of-office visits when he was expected to complete 100. (*Id.*). Plaintiff also failed to meet certain administrative obligations, such as submitting travel vouchers on time or completing office inventories. (*Id.*). Plaintiff admitted that he did not take steps to improve his performance after he received the Level 2 rating in 2008. (Def.'s SMF ¶ 10; ECF No. 86 ¶ 10). Instead, Plaintiff filed a grievance challenging the Level 2 performance rating, which was reviewed and denied by the ITA. (Def.'s SMF ¶¶ 11–12).

On December 18, 2008, Plaintiff was involved in a car accident and suffered injuries to his shoulder and neck. (Def.'s SMF ¶¶ 13–14). As a result of the accident, Plaintiff was unable to work for three months and, upon his return to the office, was unable to fully perform his duties. (Def.'s SMF ¶¶ 14–15; Pl.'s SMF ¶ 19). In May 2009, Plaintiff received a mid-year review covering October 2008 to April 2009, which showed that he failed to meet "several critical elements of his performance plan," such as "customer service, client results, and resource management," and that he also did not comply with the routine tasks requested by supervisors. (Def.'s SMF ¶¶ 16–18). Plaintiff did not challenge this evaluation, but claims that the mid-year review failed to consider that he was absent from work for three months due to the 2008 car accident. (Def.'s SMF ¶ 19; ECF No. 86 ¶ 16).

In June 2009, Joel Reynoso, Plaintiff's supervisor and the director of the Newark office of the ITA, issued Plaintiff an official letter of reprimand, criticizing Plaintiff's refusal to take notes in a meeting, errors in filling out travel vouchers, and tardiness in entering his time and completing projects. (Def.'s SMF ¶¶ 20–21, 51). Reynoso concluded the letter by providing Plaintiff with

information on how to receive help if he was experiencing personal or other issues that contributed to his unsatisfactory work performance. (Def.'s SMF ¶ 24). Plaintiff did not challenge or respond to the letter in any way and did not, at that time, disclose that he had OCD. (Def.'s SMF ¶ 25). Plaintiff received another Level 2 performance rating for fiscal year 2008–2009. (Def.'s SMF ¶ 28).

On March 2, 2010, Plaintiff was involved in another car accident and suffered in hearing loss, neck and back injuries, and an aggravation of his OCD symptoms. (Def.'s SMF ¶¶ 29–30). When Plaintiff returned to work in May 2010, according to Defendant, he was absent at least once a week for medical appointments. (Def.'s SMF ¶ 31). Plaintiff contests this description and states that he was permitted to work less than full time so that he could attend his medical appointments. (ECF No. 86 ¶ 31). Regardless, Plaintiff concedes that his physical injuries from the 2010 car accident had such a devastating impact on his OCD that it greatly affected his ability to perform various aspects of his job. (Def.'s SMF ¶¶ 31–33; ECF No. 86 ¶¶ 32–33).

In light of the 2010 car accident, Reynoso reduced Plaintiff's end-of-year requirements. (Def.'s SMF ¶ 37). Though it is disputed whether these reductions were proportionate to account for Plaintiff's approved absences, the parties agree that Reynoso nearly halved Plaintiff's required counseling sessions, out-of-office visits, and expected export successes. (Def.'s SMF ¶¶ 38–40; ECF No. 86 ¶ 37). Nevertheless, Plaintiff failed to meet these reduced quotas for fiscal year 2009–2010. (Def.'s SMF ¶¶ 38–40). Specifically, Plaintiff completed (1) one out of the required fifty-eight out-of-office visits; (2) forty out of the required 116 counseling sessions; and (3) nine out of the required sixteen expected export successes. (*Id.*). In his annual review, Reynoso noted that Plaintiff had good customer service skills and rapport with clients, but that he continued to fail at completing administrative requirements. (Def.'s SMF ¶¶ 41–42). Based on these reviews,

Plaintiff again received a Level 2 performance rating for fiscal year 2009–2010. (Def.'s SMF ¶ 43).

Due to Plaintiff's alleged "repeated failures to meet his administrative obligations," Reynoso issued a letter on December 13, 2010 recommending that Plaintiff be suspended for three days. (Def.'s SMF ¶ 44). In the letter, Reynoso wrote that Plaintiff failed to timely validate his time and attendance even though he was reminded on several occasions between April 2010 and November 2010 to do so. (Def.'s SMF ¶ 45). Reynoso also pointed out in his letter that Plaintiff was previously reprimanded in June 2009 for the same problem of failing to properly submit his time and attendance. (*Id.*). Plaintiff opposed the proposed suspension with a written memorandum, but did not include a reference to his OCD, a request for an accommodation, or an allegation that the suspension was discriminatory. (Def.'s SMF ¶¶ 48–49). The ITA accepted and implemented the proposed suspension. (Def.'s SMF ¶ 50).

From January 2011 to April 2011, Reynoso temporarily left the ITA's Newark office for a training program. The director of a nearby office of the ITA, Joan Kanlian, served as the acting director of the Newark office. (Def.'s SMF ¶ 51). During her time as acting director, Kanlian observed that Plaintiff "had very little or no productivity in [the ITA's] key areas of output" and recommended that Plaintiff be put on a performance improvement plan ("PIP"). (Def.'s SMF ¶¶ 52–53). On February 7, 2011, Kanlian contacted the human resources department for guidance on how to implement an effective PIP for Plaintiff. (Def.'s SMF ¶ 53). Defendant claims that Kanlian, Reynoso, personnel from the human resources department, and an attorney with Commerce's Office of General Counsel then drafted a PIP for Plaintiff over a three-month period. (Def.'s SMF ¶ 54). Plaintiff contests this assertion, and claims that the decision to issue Plaintiff a PIP was not made until after his April 26, 2011 mid-year performance review. (ECF No. 86 ¶

54).  Plaintiff also claims that the PIP was drafted only by Reynoso and Kanlian, but concedes that the others had input.  (*Id.*).

Around the time that Defendant claims that Plaintiff's PIP was being drafted, on February 21, 2011, Plaintiff submitted, for the first time in the record, an accommodation request related to his OCD symptoms.  (Def.'s SMF ¶ 55).  Specifically, Plaintiff sought (1) 100% additional time to complete his work responsibilities; (2) the ability to work out of the office four days a week; (3) a reduction in the amount of driving time; and (4) a reduction in workplace stress through "clear communication of deadlines and expectations," with consideration and sensitivity towards his OCD symptoms.  (Def.'s SMF ¶ 56).

Kanlian worked with Commerce's reasonable accommodation coordinator to develop a response to Plaintiff's requests, and met with Plaintiff on March 28, 2011 to provide Plaintiff with those responses.  (Def.'s SMF ¶ 58; *see also* ECF No. 84-30 (the accommodation determination)).  Specifically, Kanlian explained that Plaintiff's requests for four days of working out of the office and for reduced driving time were granted in full, provided that Plaintiff met his requirements.  (Def.'s SMF ¶ 59; Pl.'s SMF ¶ 82).   Kanlian further explained that Plaintiff's request for 100% additional time to complete assignments was denied, as such an accommodation could not be implemented without "eliminating essential functions from [Plaintiff's] job or lowering performance standards."  (Def.'s SMF ¶ 60).  However, Kanlian eliminated certain non-essential tasks, such as inventory control and training new trade specialists in the office, to free up time.  (ECF No. 84-30 at 1–2).  Kanlian also granted Plaintiff's request to reduce stress to the extent that she agreed to communicate the ITA's deadlines and expectations to Plaintiff, and invited Plaintiff to provide any other suggestions that would reduce stress.  (Def.'s SMF ¶ 61).

Plaintiff did not file a grievance regarding these determinations, nor did he provide any further input on Kanlian's proposed accommodations. (Def.'s SMF ¶ 63). Instead, Plaintiff submitted another accommodation request on April 21, 2011, which was written by Plaintiff's physician, Dr. Laikin, and criticized Kanlian's management and the ITA's "heavy-handed, arbitrary and capricious . . . [and] unacceptably nonprofessional" work environment. (Def.'s SMF ¶¶ 64–65). By the time that the letter was received by the ITA, Reynoso had returned from his training program and issued a response denying Plaintiff's request and explaining that accommodations for Plaintiff's workplace stress were already addressed by Kanlian's March 2011 findings. (Def.'s SMF ¶¶ 68–70).

On April 26, 2011, Kanlian and Reynoso drafted a mid-year review for Plaintiff and found Plaintiff's performance in all of the core elements of his position to be "unacceptable," specifically in the areas of "customer service, client results, partnership development and outreach, and . . . resource management." (Def.'s SMF ¶¶ 71–71). Kanlian and Reynoso also noted that several companies complained that Plaintiff was unresponsive to their communications, which is a complaint that neither Kanlian nor Reynoso had supposedly received before. (Def.'s SMF ¶¶ 73–74). Plaintiff's mid-year assessment showed that he (1) did not have any of the twelve local credits or fifteen export successes that he was supposed to obtain; (2) completed only thirty-one of the eighty required counseling sessions and three of the forty required face-to-face counseling sessions; and (3) failed to properly record appointments and incorrectly entered his time and attendance. (Def.'s SMF ¶¶ 75–80).

Based on this mid-year assessment, Reynoso met with Plaintiff on May 12, 2011 to implement the abovementioned PIP, which spanned sixty days and was intended to improve Plaintiff's performance. (Def.'s SMF ¶¶ 81–83). The specific objectives of the PIP were as

follows: (1) Customer Service; (2) Export Successes and Client Results; (3) Outreach and Partnership; and (4) Resource Management. (Def.'s SMF ¶¶ 85–87; *see also* ECF No. 84-37 (the PIP)). The requirements that Plaintiff needed to meet for each of these objectives, and how he could meet them, were provided in detail in the PIP. (Def.'s SMF ¶ 88; *see also* ECF No. 84-37). Throughout the duration of the PIP, Reynoso and Plaintiff met regularly to discuss Plaintiff's progress. (Def.'s SMF ¶ 90). During Plaintiff's performance under the PIP, on or around June 13, 2011, Plaintiff submitted another accommodation request related to his loss of hearing from the 2010 car accident, which Reynoso granted. (Def.'s SMF ¶¶ 91–94).

At the end of the PIP's sixty-day duration, Plaintiff did not request an extension and Reynoso found that Plaintiff failed to show improvement under any of the four factors listed in the PIP. (Def.'s SMF ¶¶ 90, 96). As a result, on November 21, 2011, Reynoso issued Plaintiff a detailed Notice of Proposed Removal, which explained that Plaintiff failed to meet the four critical objectives of the PIP and provided examples of same. (Def.'s SMF ¶¶ 97–98). Plaintiff submitted opposition, but Plaintiff did not claim that his proposed removal was based on retaliation or discrimination. (Def.'s SMF ¶¶ 100–01). On February 21, 2012, the ITA accepted Reynoso's proposal to remove Plaintiff from federal service. (Def.'s SMF ¶¶ 102). Plaintiff filed an administrative challenge of the ITA's decision to terminate his employment and rejection of his accommodation requests, which was denied by an administrative law judge who found in part that the ITA terminated Plaintiff for performance-based reasons. (Def.'s SMF ¶¶ 105–08). Plaintiff appealed this decision to the EEOC, who found against Plaintiff and concurred with the administrative law judge on all grounds. (Def.'s SMF ¶ 109).

Accordingly, on March 18, 2015, Plaintiff filed this action against Defendant. (ECF No. 2). On August 18, 2016, Plaintiff filed an amended complaint, alleging a cause of action for

disability-based discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and a cause of action for violation of the anti-retaliation provision of the Rehabilitation Act, which incorporates by reference § 12203(a) of the American with Disabilities Act, 42 U.S.C. § 12101 ("the ADA"). (ECF No. 39 ("FAC") ¶¶ 67–75). In his amended complaint, Plaintiff alleges that Defendant (1) "fail[ed] to reasonably accommodate Plaintiff's disabilities;" (2) "fail[ed] to engage in an interactive process with regard to providing reasonable accommodations;" (3) "subject[ed] Plaintiff to a performance improvement plan that was punitive in nature and only served to exacerbate Plaintiff's disabling symptoms and undermine his work;" and (4) "terminat[ed] Plaintiff's employment" with a discriminatory and retaliatory motive. (FAC ¶¶ 70, 74). Plaintiff seeks among other things damages and a direction from this Court "that Defendant expunge all references to Plaintiff's purported work deficiencies and removal from his federal employment personnel records." (FAC at p. 16–17). Defendant now moves for summary judgment.

## II.     LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists "no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed

factual issues, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III. DISCUSSION

### A. *McDonnell Douglas* **Framework**

In determining this motion for summary judgment, the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) ("the *McDonnell Douglas* test"), applies to each of Plaintiff's statutory claims. *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2006) (stating that the *McDonnell Douglas* test applies to a discrimination claim brought pursuant to the Rehabilitation Act); *Mastrolia v. Potter*, No. 08-5967, 2010 WL 1752531, at *11–12 (D.N.J. Apr. 27, 2010) (applying the *McDonnell Douglas* test to a retaliation claim brought pursuant to the Rehabilitation Act).

Under the *McDonnell Douglas* test, a plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802; *see also Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (applying the *McDonnell Douglas* test to a retaliation claim). If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to articulate such a reason, the plaintiff must then show that the proffered reason was a pretext for a discriminatory decision in order to survive summary judgment. *Id.* at 804–05. A plaintiff seeking to avoid summary judgment at the pretext stage must offer sufficient evidence that would "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action

(that is, the proffered reason is a pretext)." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citations and emphasis omitted).

## B. Step 1: Plaintiff's Burden to Establish a *Prima Facie* Claim

As an initial matter, Defendant does not dispute for purposes of this motion that Plaintiff can articulate a *prima facie* claim of retaliation under the Rehabilitation Act. (ECF No. 84-1 at 33). Therefore, the Court assumes without further analysis that Plaintiff's Retaliation Claim meets the standard of the first step of the *McDonnell Douglas* test.

Upon a review of the amended complaint, and for ease of this discussion, the Court notes that Plaintiff's cause of action for discrimination under the Rehabilitation Act consists of three individual claims which will be analyzed separately: (1) the "Discrimination Claim," which consists of Plaintiff's allegations that he was discriminatorily discharged and subjected to the PIP in an attempt to punish rather than assist him; (2) the "Accommodation Claim," which consists of Plaintiff's allegations that Defendant failed to reasonably accommodate his OCD; and (3) the "Interactive Process Claim," which consists of Plaintiff's allegations that Defendant did not involve Plaintiff in the process of accommodating Plaintiff's disability. For the reasons stated below, the Court finds that Plaintiff sufficiently established a *prima facie* case for his Discrimination Claim, but failed to do so for his Accommodation and Interactive Process Claims.

### 1. Discrimination Claim

A *prima facie* claim for discrimination under the Rehabilitation Act requires Plaintiff to show that (1) he has a disability; (2) he was qualified for the position "with or without reasonable accommodations by the employer"; and (3) despite his qualifications, he was nevertheless terminated or otherwise precluded from performing the job. *Wishkin*, 476 F.3d at 184–85. For purposes of this motion, Defendant concedes that Plaintiff can show both that he suffers from a

disability and that he was terminated and/or was otherwise prevented from performing his job as a trade specialist. (ECF No. 84-1 at 18). Therefore, the Court's analysis shall focus on the second prong, *i.e.*, whether Plaintiff was qualified for his position as a trade specialist.

In claiming that Plaintiff is unqualified for his position with the ITA, Defendant raises two arguments: (1) Plaintiff is judicially estopped from claiming that he was qualified for a position with the ITA based on his representations in his social security benefits application; and (2) Plaintiff's poor performance reviews show his lack of qualification for a position with the ITA. (ECF No. 84-1 at 19–21).

a. *Judicial Estoppel*

Defendant first argues that Plaintiff is judicially estopped from alleging that he is qualified for his position with the ITA, because Dr. Laikin opined in Plaintiff's 2014 application for social security benefits that Plaintiff was "totally disabled" and unable to perform any aspect of his job as a trade specialist beginning in March 2010 through his termination in February 2012. (ECF No. 84-1 at 19–20). Defendant cites several district court cases to support this argument. *See, e.g., Morris v. Siemens Components, Inc.*, 928 F. Supp. 486, 496–97 (D.N.J. 1996) (finding that the plaintiff was judicially estopped from arguing that she was qualified to perform her job at the time of her discharge when she simultaneously represented that she was unable to work in her application for employment benefits); *McNemar v. Disney Stores, Inc.*, No. 94-6997, 1995 U.S. Dist. LEXIS 9454, at *3 (E.D. Pa. June 30, 1995) ("Although the Third Circuit has not directly addressed this issue, most federal courts agree that an employee who represents on a benefits application that he is disabled is judicially estopped from arguing [in a discrimination action] that he is qualified to perform the duties of the position involved."), *aff'd*, 91 F.3d 610 (3d Cir. 1996); *see also LaRochelle v. Wilmac Corp.,* 210 F. Supp. 3d 658, 710 (E.D. Pa. 2016) (applying judicial

estoppel to a plaintiff attempting to claim she was qualified for her position when she stated in her worker's compensation application that her work related injury caused her to stop working and left her fully disabled), *aff'd*, No. 17-3349, 2019 WL 1769077 (3d Cir. Apr. 22, 2019).

The Court does not agree that Plaintiff is judicially estopped from claiming that he was qualified for his position with the ITA. The Court first notes that each of the district court cases cited by Defendant involved a detailed application of the particular facts of that case, and this Court is not bound by those determinations. Furthermore, in cases decided after *Morris* and *McNemar*, the Third Circuit Court of Appeals has stated that "there is no necessary inconsistency in simultaneously representing oneself as unable to work for [social security benefits] purposes yet able to work for ADA purposes," because the Social Security Administration does not take the possibility of reasonable accommodations into account, whereas actions under the ADA and Rehabilitation Act do. *Bisker v. GGS Info. Servs., Inc.*, 342 F. App'x 791, 794–95 (3d Cir. 2009); *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 608 (3d Cir. 2006) (finding that plaintiff's statements in a social security benefits application did not judicially estop her in a subsequent ADA action where she proposed reasonable accommodation requests, which were not accounted for by the Social Security Administration); *see also Mastrolia v. Potter*, No. 08-5967, 2010 WL 1752531, at *3 (D.N.J. Apr. 27, 2010) (citing several Third Circuit Court of Appeals cases and explaining that "cases under the ADA apply with equal force when interpreting the standards of the Rehabilitation Act."). Therefore, the Court will not only look at the fact that Plaintiff filed a claim for social security benefits, but instead will analyze whether the specific statements made by Plaintiff in his application for social security benefits were consistent with those in this action. *See Bisker*, 342 F. App'x at 795.

The Court finds that Plaintiff's representations in his application for social security benefits and in filings related to this action are consistent. While Dr. Laikin's letter in support of Plaintiff's application for social security benefits stated that the combination of OCD and the two car accidents left Plaintiff "totally disabled," Dr. Laikin further testified in connection with this action that Plaintiff would have been able to perform his job as a trade specialist after the March 2010 accident had Defendant provided him with further reasonable accommodations, such as additional time to complete assignments. (ECF No. 86-3 at 301:1–04:13). This is consistent with Plaintiff's allegations before this Court, which are, in substance, that he could have performed his job as a trade specialist had Defendant granted his reasonable accommodation requests instead of allegedly engaging in discriminatory activities such as denying his requests and taking adverse employment actions against him. (*See* ECF No. 85 at 24–25). The Court disagrees with Defendant's first argument and shall not apply judicial estoppel to Plaintiff's claim of qualification for a position with the ITA.

b. *Application of Plaintiff's Performance Reviews on his Qualification*

Defendant also argues that Plaintiff's lack of qualifications can be shown through his poor performance reviews and the complaints of his supervisors. While these facts are relevant to other sections in the analysis of Defendant's motion, the Court does not find them dispositive as to Plaintiff's qualifications for holding his position as a trade specialist. *See Pizio v. HTMT Global Sols.*, No. 09-1136, 2014 WL 2926499, at *4 (D.N.J. June 27, 2014) ("Determining whether or not Plaintiff performed his job satisfactorily is part of the pretext stage of the [*McDonnell Douglas* test].") (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)). Here, Plaintiff has put forward uncontested facts that he has both a bachelor's and a master's degree in economics, has worked in this field for over thirty years, and has received some measure of praise in his

performance reviews, (*see* Def.'s SMF ¶ 8; Pl.'s SMF ¶ 2), which the Court finds to be sufficient for purposes of the first step of the *McDonnell Douglas* test to show that Plaintiff was qualified for a trade specialist position. Therefore, the Court finds that Defendant is not entitled to summary judgment as to Plaintiff's *prima facie* case for his Discrimination Claim.

### 2. Accommodation Claim

The *prima facie* elements for Plaintiff's Accommodation Claim are identical to those for his Discrimination Claim, but with the additional element that Plaintiff must show that a reasonable accommodation was possible. *See Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 229 (3d Cir. 2000) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."); *see also Mastrolia*, 2010 WL 1752531, at *3 (citing several Third Circuit Court of Appeals cases and explaining that "cases under the ADA apply with equal force when interpreting the standards of the Rehabilitation Act.").

Here, Plaintiff is able to show that he suffers from the disability of OCD and was otherwise qualified for his position as a trade specialist for the same reasons articulated as to Plaintiff's Discrimination Claim. However, Plaintiff is unable to show that he made any reasonable accommodation requests that Defendant failed to respond to. The record reflects that Plaintiff made the following accommodation requests: (1) for 100% additional time to complete assignments; (2) working out of the office four days a week; (3) reduced driving time; (4) a reduction in workplace stress through "clear communication of deadlines and expectations," and consideration and sensitivity towards his OCD symptoms; and (5) accommodations related to his hearing loss. (Def.'s SMF ¶¶ 56, 93).

It is uncontested that Plaintiff's request to work out of the office, for reduced driving time, and to accommodate his hearing loss were all granted, and are therefore not actionable. (*See* ECF No. 84-30 (March 28, 2011 accommodation decision); ECF No. 84-40 (June 30, 2011 accommodation decision)). Plaintiff's remaining requests were impracticable, or could not be reasonably accommodated, and therefore do not support a *prima facie* claim for failure to provide reasonable accommodations.

First, Plaintiff's request for 100% additional time to complete assignments was impracticable because, as explained by Kanlian, it could not be implemented without eliminating essential functions of Plaintiff's position or otherwise lowering the performance standards of the trade specialist position. *See S.E. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979) (finding in a discrimination-based case that the defendant-nursing college was not required "to lower or to effect substantial modifications of standards to accommodate a handicapped person."); *Meyers v. Conshohocken Catholic Sch.*, No. 03-4693, 2004 WL 3037945, at *9 (E.D. Pa. Dec. 30, 2004) ("an employer need not eliminate the essential functions of a position in order to accommodate an employee's disability."). Plaintiff has not pointed to any genuine issue of material fact to dispute this point.

Second, Plaintiff's request for a less stressful work environment, which was articulated in Plaintiff's February 21, 2011 and April 21, 2011 letters, is similarly insufficient to establish a *prima facie* claim for failure to provide reasonable accommodations. The Third Circuit Court of Appeals has specifically held that an employer is not required to implement a proposed accommodation request to ensure that the employee is not subjected to prolonged or inordinate stress. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998). In reaching this decision, the Third Circuit Court of Appeals explained that such a "proposed accommodation would impose

a wholly impractical obligation on" the employer, because the employer's "compliance would depend entirely on [the disabled employee's] stress level at any given moment" and would turn "on an infinite number of variables, few of which [the employer] controls." *Id.* Moreover, such an accommodation would require this Court to dictate "the conditions of [Plaintiff's] employment, most notably, with whom he will work." *Id.* Contrary to Plaintiff's argument that the decision in *Gaul* only applies to situations where the claimant is complaining of anonymous coworkers, (ECF No. 85 at 31), the Court finds it clear from the plain language quoted above that a request for a reduction in stress, such as the one proposed by Plaintiff, is impractical and fails as a matter of law.

Accordingly, the Court finds that the accommodations proposed by Plaintiff were either granted or impracticable, and that summary judgment must therefore be entered in favor of Defendant on Plaintiff's Accommodation Claim.

3. Interactive Process Claim

"To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." *Taylor*, 184 F.3d at 311 (quoting 29 C.F.R. § 1630.2(o)(3)). In other words, Plaintiff can establish a *prima facie* claim that Defendant failed to engage in an interactive process by showing that (1) Defendant knew about Plaintiff's disability; (2) Plaintiff requested an accommodation; (3) Defendant did not make a good faith effort to respond to Plaintiff's request; and (4) Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith. *Id.* at 319–20.

Here, it is uncontested that Defendant learned of Plaintiff's OCD disability in April 2010 and Plaintiff made accommodation requests in his February 21, 2011 and April 21, 2011 letters. (*See* Def.'s SMF ¶¶ 2, 55, 64–65). Nevertheless, judgment must be entered in Defendant's favor, as the Court has already determined above that Plaintiff has not made a request for a *reasonable* accommodation in the two relevant areas -- 100% additional time to complete assignments and a less stressful work environment. *See Whelan v. Teledyne Metalworking Prods.*, 226 F. App'x 141, 147 (3d Cir. 2007) (explaining that "failure to participate in the interactive process is not a ground for liability unless . . . a reasonable accommodation existed and the employer unreasonably failed to provide it").

Even assuming *arguendo* that Plaintiff's accommodation requests were reasonable, Defendant would still be entitled to judgment in his favor because Plaintiff cannot show that Defendant failed to make a good faith effort to accommodate Plaintiff's requests. As stated above, Defendant granted Plaintiff's requests to work out of the office, reduce his driving time, and accommodate his hearing loss. Even when Kanlian rejected Plaintiff's requests, she still explained her decision and implemented other accommodations to assist Plaintiff. For example, Kanlian rejected Plaintiff's request for 100% additional time to complete assignments but eliminated certain non-essential tasks, such as inventory control and training new trade specialists in the office, to free up time. (Def.'s SMF ¶¶ 60–61; ECF No. 84-30 at 1–2). As another example, Kanlian rejected Plaintiff's request to reduced stress in the workplace but agreed to communicate deadlines and expectations in writing. (Def.'s SMF ¶ 61; ECF No. 84-30 at 4).

The Court also observes that Defendant informed Plaintiff about the reasoning behind the accommodation determinations and provided Plaintiff with opportunities to offer suggestions on how to further assist his performance. Kanlian and/or Reynoso, among other things, (1) included

in their communications to Plaintiff a method to contest their decision or file a grievance; (2) invited Plaintiff to provide any suggestions or further proposals to accommodate his disability; and (3) provided Plaintiff with information about where to receive help in the event that his allegedly unsatisfactory performance was caused by personal issues. (Def.'s SMF ¶¶ 24, 47, 61–62).

Despite these opportunities, it is uncontested that Plaintiff did not dispute any of Kanlian or Reynoso's accommodation request findings, provide them with further input, or otherwise file a grievance. (Def.'s SMF ¶ 63). The Court does not find that Defendant, who responded to Plaintiff's accommodation requests, can be accountable for Plaintiff's failure to further engage in the accommodation process. *See Sturm v. UAL Corp.*, No. 98-264, 2000 U.S. Dist. LEXIS 13331, at *35–38 (D.N.J. Sept. 5, 2000) (granting the defendant's motion for summary judgment and reasoning that the defendant, who responded to plaintiff's accommodation request by requesting further information, could not be held liable for an interactive process claim based on the plaintiff's "failure to cooperate" and provide the requested information). Accordingly, the Court finds that Plaintiff cannot show that Defendant lacked good faith in responding to his accommodation requests, and therefore judgment must be entered in Defendant's favor on Plaintiff's Interactive Process Claim.

### C. Step 2: Defendant's Burden to Show Legitimate Reason for Conduct

Having established a *prima facie* case for both Plaintiff's Discrimination and Retaliation Claims, the burden now moves to Defendant to assert a legitimate, non-discriminatory reason for the disparate treatment and termination of Plaintiff. *Wishkin*, 476 F.3d at 185. "If the employer [sets] forth a legitimate business explanation, then the presumption of discriminatory intent created by the employee's prima facie case is rebutted and the presumption simply drops out of the picture." *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 698 (3d Cir. 1995) (internal quotations

omitted). The defendant's burden at the second step of the *McDonnell Douglas* test "has been described as 'relatively light,' and is deemed 'satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason.'" *Cross v. Brennan*, No. 12-2670, 2016 U.S. Dist. LEXIS 120332, at *18 (D.N.J. Sept. 6, 2016) (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)).

Here, the Court finds, and Plaintiff does not seem to contest, that Defendant easily demonstrates a legitimate non-discriminatory reason for Plaintiff's termination and the other alleged adverse employment actions taken against him. Defendant claims that this case has nothing to do with discrimination or retaliation, but rather pertains to an employee who was justifiably terminated for failing to meet his legitimate and expected productivity requirements despite the reasonable accommodations provided by Defendant. (ECF No. 84-1 at 24–25). This narrative is supported by the uncontested facts in the record. Both before and after Plaintiff disclosed his OCD disability in April 2010, Reynoso and Kanlian attempted to account for Plaintiff's medical needs in evaluating his performance. For example, Reynoso nearly halved the amount of counseling sessions, out-of-office visits, and expected export successes Plaintiff was required to meet after the 2010 car accident. (Def.'s SMF ¶¶ 37–40). As another example, Kanlian granted several of Plaintiff's February 2011 proposed accommodations, such as working out of the office four days a week, and even provided some level of accommodation for the February 2011 requests that she appropriately rejected, such as denying the majority of Plaintiff's proposed accommodation for workplace stress but still providing clear communication of tasks and goals. (Def.'s SMF ¶¶ 59, 61; ECF No. 84-30 at 4).

Despite these accommodations, according to Defendant, Plaintiff consistently failed to meet the requirements of his position going back as far as 2008 until his termination in February

2012.  In almost every annual and semi-annual review, Defendant rated Plaintiff's performance at a Level 2 or lower based on nearly identical complaints, *i.e.*, failing to (1) complete the required number of out-of-office visits, counseling sessions, and export successes; and (2) properly record and submit his time and attendance.  (Def.'s SMF ¶¶ 8–9, 16–18, 28, 38–40, 43, 75–80).  In addition to his performance reviews, Defendant also made Plaintiff aware of his allegedly unsatisfactory performance through Reynoso's June 22, 2009 letter of reprimand and December 13, 2010 letter recommending suspension, which highlighted Plaintiff's abovementioned failures to meet his performance requirements.  (Def.'s SMF ¶¶ 20–25, 44).

The uncontested record reflects that Defendant gave Plaintiff several opportunities to explain and/or improve his lackluster performance.  Reynoso and Kanlian (1) ended several of their communications to Plaintiff with information on how to contest their determinations; (2) provided Plaintiff with information on how to receive help if personal or other issues were contributing to his unsatisfactory work performance; and (3) invited Plaintiff to provide suggestions on how to help further accommodate him and reduce his stress in the assessment of his accommodation requests.  (Def.'s SMF ¶¶ 24, 47, 61–62).  Nevertheless, Plaintiff specifically admitted that, after he received these reviews and reprimands, he made no effort to improve his performance or follow up on his supervisors' information requests or suggestions.  (Def.'s SMF ¶¶ 10, 19, 25–26, 49).

In response to Plaintiff's allegedly unsatisfactory performance, Kanlian purportedly began contemplating and drafting a PIP for Plaintiff as early as February 7, 2011.  (Def.'s SMF ¶ 53; ECF No. 86 ¶ 53 (Plaintiff conceding that Kanlian began to "look into" a PIP for Plaintiff on February 7, 2011)).  In May 2011, shortly after Plaintiff received a mid-year review stating that his performance was "unacceptable," Reynoso implemented the abovementioned PIP, which

covered sixty days and was designed to improve Plaintiff's performance by providing him with specific objectives and detailed instructions on how to meet them. (Def.'s SMF ¶¶ 81–88; *see also* ECF No. 84-37 (the PIP)). At the end of the PIP's sixty-day duration, Plaintiff did not request an extension and had not met the requirements for each objective listed in the PIP. (Def.'s SMF ¶¶ 90, 96). As a result of Plaintiff's failure to satisfy the PIP and otherwise improve his performance, Reynoso issued Plaintiff a "Notice of Proposed Removal" in November 2011 and Defendant terminated Plaintiff's employment in February 2012. (Def.'s SMF ¶¶ 97, 102). Based on this narrative, which is corroborated by evidence in the record, the Court concludes that Defendant met his burden at the second step of the *McDonnell Douglas* test. Thus, the burden now shifts to Plaintiff to establish an indication of pretext.

### D. Step 3: Plaintiff's Evidence of Pretext

A plaintiff seeking to avoid summary judgment at the pretext stage must offer sufficient evidence that would "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (citations and emphasis omitted). To that end, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (quotations omitted); *see also Greenberg v. Camden Cnty. Vocational & Tech. Schs.,* 310 N.J. Super. 189, 200 (App. Div. 1998) (stating same).

Importantly, when determining whether a proffered reason is a pretext, this Court "must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

This Court must also "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* It is up to the jury to weigh the evidence, determine the credibility of testimony, and draw the necessary inferences from each. *Id.* As such, this Court must determine whether Defendant's proffered reason is a pretext by giving "credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (quoting C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed.1995)).

According to Plaintiff, Defendant imposed the PIP—which was intentionally designed in a way that Plaintiff would be unable to satisfy his requirements—in response to Plaintiff's disclosure that he suffers from an OCD disability and his requests for reasonable accommodations. Plaintiff continues that and Defendant used Plaintiff's failure to meet the PIP's requirements as a pretext for his termination and to hide Defendant's true discriminatory and retaliatory motive. (*See generally* ECF No. 85). To support this assertion, Plaintiff makes three arguments: (1) Plaintiff was only subjected to a PIP and terminated after he disclosed his OCD disability and requested accommodations; (2) Reynoso and Kanlian disregarded established policy in drafting the PIP when they failed to involve a human resources specialist in their final determination; and (3) the accommodations and the PIP implemented by Defendant were conditioned on onerous administrative requirements that were not "essential functions" of the trade specialists position. (*Id.* at 25–27, 29). For the reasons discussed herein, the Court concludes that the facts in the record, even when viewed in a light most favorable to Plaintiff, do not support Plaintiff's arguments, and there is no other evidence in the record by which a reasonable jury could find that

Defendant's non-discriminatory reason for imposing the PIP and terminating Plaintiff's employment was a pretext for a discriminatory or retaliatory motive.

1. Temporal Proximity

Plaintiff first argues that pretext can be shown because he was subjected to the PIP in April 2011 and terminated in February 2012, *i.e.*, after he disclosed his OCD disability in April 2010 and requested accommodations on February 21, 2011. (*Id.* at 26). The Court does not find the fact that Plaintiff incurred an adverse employment action after he engaged in a protected activity, without more, is indicative of a discriminatory or retaliatory motive. *See Davis v. Temple Univ. Hosp., Inc.,* No. 14-5981, 2015 U.S. Dist. LEXIS 154312, at *18 (E.D. Pa. Nov. 16, 2015) (finding temporal proximity by itself to be insufficient to support a finding of pretext when applied to the factual record of that case).

To the contrary, there does not appear to be any causation in this case between Plaintiff's disclosure and accommodation requests, on the one hand, and the adverse employments actions taken by Defendant, on the other. Plaintiff was reprimanded and received negative performance reviews starting in at least 2008, *i.e.*, long before he disclosed his OCD symptoms or made any accommodation requests. *See Verma v. Univ. of Pa.,* 533 F. App'x 115, 119 (3d Cir. 2013) ("[T]his Court has declined to infer such a causal link where an employee's negative performance evaluations predated any protected activity."); *Shaner v. Synthes (USA)*, 204 F.3d 494, 505 (3d Cir. 2000) (explaining that an adverse employment action was not "unusually suggestive" when it started before plaintiff's first charge of discrimination). Furthermore, Plaintiff concedes that Kanlian contacted a human resources representative, Michelle Swinton-Sulewsky, on February 7, 2011 via email and asked for guidance on how to implement a PIP for Plaintiff, (Def.'s SMF ¶ 53; ECF No. 86 ¶ 53), which contradicts Plaintiff's claim that the decision to implement a PIP occurred

after Plaintiff's later-filed February 21, 2011 accommodation request. Accordingly, the Court concludes that any perceived temporal proximity in this case between Plaintiff's protected activity and any adverse employment action does not cast doubt on Defendant's proffered non-discriminatory reason for Plaintiff's termination.

### 2. Disregard of Established Policy

Plaintiff also argues that pretext can be shown from Reynoso and Kanlian's disregard of Defendant's established policy to involve a human resources specialist in the drafting of a PIP. (ECF No. 85 at 26). To support this argument, Plaintiff points to Sulewsky's deposition testimony that she (1) provided edits to the first draft of the PIP only; (2) did not review the final draft of the PIP before it was implemented; and (3) would normally be more involved in the drafting and final decision process when a PIP was issued. (ECF No. 86-4 at 43:6–45:14). Plaintiff claims that this testimony contradicts the sworn statements of Reynoso and Kanlian, who both testified that Sulewsky helped draft Plaintiff's PIP. (ECF No. 85 at 17).

The Court is not convinced that Plaintiff has sufficiently shown an established policy that was disregarded by Defendant because Plaintiff does not point to any written policy or other evidence, besides Sulewsky's testimony regarding her personal experiences, which states that a human resources specialist must be involved in the drafting process of a PIP or have a specific amount of input in same. *See Smith v. Allentown*, 589 F.3d 684, 692 n.5 (3d Cir. 2009) (rejecting Plaintiff's attempt at showing a deviation from policy requiring a mandatory progressive discipline structure, because "none of the materials he cites in support of this averment contain the text of the policy or a description of the disciplinary framework it allegedly imposes."); *McManamy v. Select Med. Corp.*, No. 14-1463, 2016 U.S. Dist. LEXIS 161419, at *26 (W.D. Pa. Nov. 22, 2016) ("Without such a baseline [of identifying an established policy] for comparison, there is no way in

which a jury could find that [the defendant] deviated from its policy in this instance in a way suggestive of pretext.").

Even if there was a policy that required input from a human resources specialist, the Court is nevertheless unconvinced that a reasonable jury could conclude that Defendant violated same, considering Sulewsky testified that she (1) helped Reynoso determine whether there was a performance issue with Plaintiff; (2) provided examples of PIPs to Reynoso and Kanlian; (3) reviewed and edited the first draft of Plaintiff's PIP; and (4) participated on conference calls with Reynoso, Kanlian, and the Office of the General Counsel after the PIP was issued. (ECF No. 86-4 at 53:5–54:11, 75:23–77:20). This testimony does not contradict the statements of Reynoso and Kanlian. For example, Kanlian testified that she and Reynoso worked with Sulewsky "from the onset," stopped working with Sulewsky "[a]t a certain point," and involved Sulewsky "again later on in the completion of the process," (ECF No. 84-24 at 491:3–7), which is consistent with Sulewsky's abovementioned testimony that she provided assistance at the beginning of the PIP drafting process, was not involved in the final draft of the PIP, and participated in conference calls regarding the PIP after it was implemented. Accordingly, the Court rejects Plaintiff's second argument and finds that the circumstances surrounding the drafting of the PIP do not raise a suspicion of pretext.

3. Administrative Requirements

Finally, Plaintiff argues throughout his opposition brief that Defendant conditioned Plaintiff's reasonable accommodations and the PIP on onerous administrative responsibilities. (*See* ECF No. 85 at 3, 29–30). According to Plaintiff, these administrative requirements, such as accounting for his attendance and time, were not "essential functions" of his position as a trade specialist. (*Id.*). However, Plaintiff does not offer any support for these arguments outside of his

own affidavit and deposition testimony, which is not sufficient to survive the summary judgment stage. *See Thomas v. Del. State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (stating that "unsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment"); *Gonzalez v. Sec'y of Dep't of Homeland Sec.,* 678 F.3d 254, 263 (3d Cir. 2012) (explaining that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.") (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)). Therefore, the Court finds Plaintiff's last argument that these administrative requirements were not "essential" or support a finding of pretext to be without merit.

### 4. Overall Lack of Evidence

Having rejected all three of Plaintiff's arguments, the Court finds that there is no factual support in the record, even when viewed in Plaintiff's favor, by which a reasonable jury could conclude that Defendant's non-discriminatory reason for implementing the PIP and terminating Plaintiff's employment was a pretext for a discriminatory or retaliatory motive. Plaintiff does not point to (1) any discriminatory comments made by any employee of Defendant; (2) any document or testimony that supports an inference that Plaintiff's disability played a role in the adverse employment actions taken against him; or (3) any similarly situated employees without a disability who were treated better than Plaintiff. Moreover, Plaintiff does not contest the accuracy of the performance reviews as stated by Defendant and admits that he did not attempt to improve his performance or challenge most of Defendant's evaluations. (ECF No. 86 ¶¶ 8, 10, 16–19, 25, 28, 38–43, 63, 80). Plaintiff even concedes that the requirements of the PIP were reasonable to impose on a trade specialist, (ECF No. 84-5 at 18:17–20, 20:13–19, 23:8–21, 25:21–26:3), which further contradicts the argument that the PIP was punitive in nature and only implemented to justify Plaintiff's termination. Considering that there is no evidence in the record supporting Plaintiff's

pretext narrative, the Court concludes that a reasonable jury could not find in favor of Plaintiff over Defendant's corroborated non-discriminatory reason for the adverse employment actions taken against him. Accordingly, Defendant is entitled to summary judgment on all of Plaintiff's causes of action.[3]

## IV.    CONCLUSION

For the aforementioned reasons, the Court hereby grants Defendant's motion for summary judgment. An appropriate Order follows this Opinion.

Dated: June 20, 2019.

s/ John Michael Vazquez
JOHN MICHAEL VAZQUEZ
United States District Court Judge

---

[3] Had the Court concluded that Plaintiff could show a *prima facie* case for his Accommodation and Interactive Process Claims, Defendant would nevertheless be entitled to summary judgment on those claims based on Plaintiff's failure to meet the third step of the *McDonnell Douglas* test discussed above.